Mr. Derick Tyler
MCI-Cedar Junction
P.O. Box 100
South Walpole, Ma. 02071

Tony Anastas, Clerk
United States District Court
1 Courthouse Way
Boston, Ma. 02210

Dated: 5-4-05

Re: Tyler v. Nolan,
    No. 04-CV-12680-NMG

Dear Mr. Anastas,

    Enclosed for filing please find my 28 U.S.C. § 2254
Memorandum of Law with certificate of Service and my Motion
to Appoint Counsel.

    Thank you for your attention to this matter.

                                    Very truly yours,

                                    Derick Tyler
                                    Derick Tyler, pro se

Enclosures

cc: Thomas F. Reilly,
    Attorney General

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Derick Tyler,

    Petitioner,

v.                                    Civil Action
                                      No. 04-12680-NMG
David Nolan,

    Respondent.


PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS 28 U.S.C.
§ 2254

## STANDARD OF EXHAUSTION

The exhaustion doctrine seeks to afford the state courts
a meaningful opportunity to consider allegations of legal
error without interference from the federal judiciary.
Rose v. Lundy, 455 U.S. 509,515 (1982).  Under standards
established by the Court, a state prisoner may initiate a
federal habea petition "[o]nly if the state courts have
had the first opportunity to hear the claim sought to be
vindicated. . . ." Picard v. Connor, 404 U.S. 270,276 (1971).
"It follows, of course, that once the federal claim has
been fairly presented to the state courts, the exhaustion
requirement is satisfied." Id., at 275 (quoting from
Vasquez v. Hillery, 106 S.Ct. 617,620 (1986)).

In general, the exhaustion doctrine requires that a
state defendant seeking to overturn his conviction on
federal grounds first must give the State courts "a fair

opportunity" to consider his claims. Lanigan v. Maloney,

853 F.2d 40,42 (1st Cir. 1988) (citations omitted).

## STATEMENT OF THE CASE

On July 26, 1989, the petitioner was indicted for first

degree murder on indictment numbers (079996,080162), by

a Suffolk County Grand Jury.

On April 4, 1990, the petitioner filed a notice of alibi

defense motion with the court.

On April 18, 1990, trial commenced against the petitioner.

The petitioner was found guilty on April 24, 1990 after a

seven day trial.

The petitioner timely appealed on April 27, 1990 to

the Massachusetts Supreme Judicial Court. His appeal was

denied on June 16, 1994. See Commonwealth v. Tyler, 634 N.E.

2d 912 (1994).

On June 24, 1999, the petitioner filed a motion for

new trial pursuant to Mass. R. Crim. P. 30(b).  On June

26, 2001, his motion for new trial was denied by Donovan,

J.  On July 26, 2001, the petitioner files a motion to

reconsider denial of new trial motion.  That motion was

denied on May 23,2002.

The petitioner appealed to the SJC and the Single

Justice denied his leave for appeal of the denial of his

new trial motion on September 8, 2004.

On 12/24/04, the petitioner filed his 28 U.S.C. § 2254

Petition with this Court and moved for a stay until further

-2-

exhaustion of newly discovered evidence now presently before
the state superior court.

This matter was stayed by Judge Nathaniel M. Gorton
until March 25, 2005.

## STATEMENT OF THE FACTS

John Conway is a police officer who was on the force
for nine years. (Tr. 2:20).[1] He testified that on May 22,
1989, he worked the 5 p.m. to 12:45 a.m. shift. Id.  He
was patrolling the Roxbury area in a two-man response
unit with his partner in uniform. Id.  At approximately
7:26 p.m., he received a radio call to respond to 94 Crispus
Attucks Way in Roxbury. Id.  When him and his partner
arrived at 94 Crispus Attucks Way, they observed the
victim on the front stairs on his back. (Tr. 2:23).  The
victim was unconscious and excessively bleeding from the
left chest area. Id.  An ambulance arrived shortly afterwards
and the EMTs began working on him. (Tr. 2:24).  Six to
eight minutes later he was taken by ambulance to the
hospital. Id.  After the victim was taken by the ambulance,
he observed a large pool of blood and a trail of blood
leading from the front area of 94 Crispus Attucks Way
around the corner towards the area of 14 O'Bierne Place. Id.

Marie Winbush testified that on May 22, 1989, she lived
at 12 O'Bierne Place which is around the corner from Crispus

_____

1/ In reference to the trial transcripts will be
referred to as "Tr. Vol. and page number."

-3-

Attucks Way. (Tr. 2:66). She had come in from work between 6:00 and 6:30 p.m., and was ready to prepare supper in the kitchen. (Tr. 2:70). That night she had glanced out the kitchen window and saw a group of guys outside. (Tr. 2:71). She saw the group of guys huddled over a person who was on the ground. (Tr. 2:72). She saw somebody punching at somebody who was on the ground. (Tr. 2:73). After a while, she opened her door and looked and a guy said, "Let's get out of here." Id. The group of men ran away towards the parking lot by Dale Street. Id. She was unable to see the person who was on the ground. (Tr. 2:74). She then came out of her house and went to 94 Crispus Attucks Way, and that is when she was informed that the victim was Scottie (Scott Gomes). (Tr. 2:75). She then saw Scott Gomes lying on the porch bleeding. Id. She did not recognize any of his assailants, and there were six or seven of them. (Tr. 2:76).

Dana Fisher, a witness for the prosecution, testified that he knew the petitioner by his first name only. (Tr. 2:87). And back on May 22nd of 1989, he knew the petitioner for about a year or so. Id. On May 22, 1989, he was driving his Suzuki Sidekick down Normandy Street when he saw the petitioner with two guys standing on the corner of Normandy and Brunswick Street. (Tr. 2:89). The petitioner called him and asked him for a ride. (Tr. 2:90). He said the petitioner wanted to go to Dale Street. He said

-4-

that he would take him. (Tr. 2:92). The petitioner entered
his car with two of his friends. (Tr. 2:93). As they drove
down the street some more guys jumped into his car. (Tr.
2:94). They arrived at Dale Street and parked down the
street near the park.[2] (Tr. 2:96). When they stopped, he
saw one guy outside. Id. The defendant and the guys in
the car jumped out and he drove off. (Tr. 2:97). Before
they got out of his car, he said that he heard someone
other than the petitioner say, "There's Scottie." (Tr. 2:
98). He did not know where they had went after leaving
his car. (Tr. 2:101). He stated that back in May of 1989,
he knew Scottie Gomes. (Tr. 2:104).

On cross examination, Dana Fisher testified that a
few days after the killing, he was contacted by the police
and made a statement. (Tr. 2:105). He stated that his
day started around three o'clock in the afternoon when he
dropped his mother off at work. (Tr. 2:105-106). Then he
went over to his girlfriend's house. (Tr. 2:106). He
then states to defense attorney that he took his mother
to work at 2:30 p.m. (Tr. 2:107). Also at 2:30 p.m. he
went to his girlfriend's house.[3] Id. After leaving his
girlfriend's, he ran into the petitioner and the petitioner

2/ The park they had parked near is the former "Washington
Park," now named "Malcolm X Park."

3/ It is clear that he is not being honest about his wherabouts
on that day because he first says that his day started at
3 o'clock when he took his mother to work and then went to
his girlfriend's. Then he says he took his mother to work
at 2:30 p.m. and also went to his girlfriend's at the same
time. This is humanly impossible. He is lying.

-5-

asked for a ride. (Tr. 2:108). The petitioner never showed
him a knife through the ride. Id. The petitioner never
spoke of killing anyone during the ride. (Tr. 2:108-109).
The guys in the car never spoke on Scottie Gomes and
that they were going to get him. (Tr. 2:110). No one
showed any weapons. Id. He stated that there were only
three men who were in the car. (Tr. 2:114)[4]. He did not
associate the petitioner and his companions with what had
happened to Scott Gomes. (Tr. 2:115).

   Tony Murrell, another prosecution witness, testified
that he knew the petitioner for about a month or so prior
to May 22nd of 1989. (Tr. 2:122). He did not know the
petitioner's full name, he only knew him by Derrick. (Tr.
2:123). He knew the victim, Scott Gomes, most of his
life. Scott Gomes was his friend. Id. On May 22, 1989,
he was in the vicinity of the Washington Park area. (Tr.
2:124). He was on Dale Street. Id. While standing on
the corner of Dale and Regent Street, he saw a blue Suzuki
Sidekick. Id. Before he saw the Sidekick, he saw Scott
Gomes at Washington Park by Dale Street. (Tr. 2:125).
Scott Gomes was sitting there talking to a friend. Id.
Then a blue Sidekick pulled up and some guys jumped out
and started chasing Scottie. (Tr. 2:127). He saw eight

---

4/ Earlier he testified that Mr. Tyler entered his car
with two men and then he picked up at least two more men
down the street some. This would number at least five
men—six, including himself, which contradicts his
present testimony.

people jump out of the Suzuki Sidekick and chase the victim. (Tr. 2:127).[5] When Scottie saw the Jeep, he took off running up Dale Street by Crispus Attucks Way. (Tr. 2:128). The men then chased him on to O'Bierne Place. (Tr. 2:132). He lost sight of them once they had hit the corner from the parking lot. (Tr. 2:133). When they jumped out of the Jeep he alleged to have saw knives in some of the guys hands, in particular, the petitioner. (Tr. 2:136). When they came back out of the parking lot, he alleged to have seen a knife in the petitioner's hand. (Tr. 2:136,137). After that he went to see what happened. (Tr. 2:145). He went to O'Bierne Place up to Crispus Attucks Way and that is where he saw Scott Gomes lying on the ground with a stab wound to his chest. (Tr. 2:147). Scott Gomes was a close friend to him. (Tr. 2:161). He has an interest in the outcome of the case. Id.[6] He could not describe what any of the passengers in the Jeep looked like except for the petitioner. (Tr. 2:166).[7] He testified that every man who exited the Jeep had a knife. (Tr. 2:174). And when they all returned through the parking lot their knives were in hand not concealed. (Tr. 2:180). Afterwards, he figured there might have been a problem and went to see

5/ Dana Fisher testified that his car only fits three maximum in his car, and that the petitioner entered his car with only two people. Dana Fisher is not being truthful.

6/ This being a known truth, he will practically say or do anything to make sure that the petitioner is convicted. Even lie.

7/ This is interesting because he did not personally know the petitioner nor did he know his full name, he never was introduced to him, and he only saw him once before prior to May 22, 1989.

what happened. (Tr. 2:181). And that is when he saw Scott
Gomes. Id. He then heard sirens and knew that the police
were on their way but he left the scene before the police
arrived. Id.

On November 9, 2004, Tony Murrell signed an affidavit
recanting his trial testimony. Mr. Murrell states in
his affidavit that "I come now to recant my testimony and
honestly say that my testimony against Derick Tyler was
false, and the police and trial prosecutor knew that."
Aff. of Tony Murrell at ¶ 3. He goes on to say "I am
telling the truth here because I did see the group of men,
but not with knives in their hands and I said that Derick
Tyler was "the main one" when actually I didn't see him
then because I didn't know him then and what he looks like,
and I don't know him now." Id., at ¶ 8.

Derrick Winbush testified for the prosecution that on
May 22, 1989, he was in the area of Washington Park. (Tr.
2:198). He knew Scott Gomes for ten years or more. Id.
In May of 1989, he did not know the petitioner. (Tr. 2:
199). On May 22, 1989, he saw Scott Gomes at Washington
Park at the basketball courts. (Tr. 2:200). There were a
bunch of boys chasing him. Id. There were six men chasing
him. (Tr. 2:201). He then heard "Deek" yell, "Derrick,
Derrick, Derrick." (Tr. 2:203). Derrick Winbush then went
to Deek and asked him what do he want, because he thought

-8-

Deek was calling him. (Tr. 2:203). Then the petitioner stopped
in front of him and said to Deek, "What the fuck you cal-
ling my name for; what was you yelling my fucking name for."
(Tr. 2:206). He then alleges that the petitioner further
said, "Man, fuck that man. Everytime I see that mother-
fucker, I'm going to try to kill him. He tried to kill
me." Id. He said that when the petitioner approached
him and Deek, he had a knife in his hands with blood on
it. (Tr. 2:207). He states that he never saw the petitioner
before nor did he know his name. (Tr. 2:208). After this,
he went over to 94 Crispus Attucks Way to see what happened,
and he saw Scottie on the ground and a man trying to
resuscitate him. (Tr. 2:211). He left before the police
came. Id.

On cross examination, he testified that on occasions
he used the name Nate as an alias. (Tr. 3:8). He also used
the name Robert (which is his brother's name) as an alias.
Id. He testified that he was presently living with his
mother at 12 O'Bierne Place. (Tr. 3:9). And that that was
also his place of residency at the time of the murder back
on May 22, 1989. Id. He testified that he lived nowhere
other than with his mother. But in a prior arrest, he gave
the arresting officer an address of 23 Lawrence Avenue as
his place of residency. (Tr. 3:10). He stated that he
works for a temp agency but he has not worked for quite
some time. (Tr. 3:11). He is a heroine addict. (Tr. 3:13,14).

-9-

Prior to May 22nd, 1989, he would not have recognized who the Petitioner was. (Tr. 3:18). If someone yelled the petitioner Derick Tyler's name he would not have known who he was. Id. If he passed the petitioner on the streets, he would not have known who he was. (Tr. 3:19). He said that when he saw the group of men chasing Scott Gomes, he did not recognize anyone. Id. He alleged to have been in the petitioner's presence for about fifteen seconds and from that he alleges to have saw a bloody knife in the petitioner's hand. (Tr. 3:19-20).[8] At the police station while looking through the photo book, and after looking at several photos, he picked out the defendant's photo but said that he was unsure if he was the person. (Tr. 3:21). When he saw the groups of guys emerge from the parking lot, he did not notice anyone carrying knives. (Tr. 3:28,29). He said that the petitioner came up to where he was and spoke to Deek and told him that, "That guy tried to kill me." (Tr. 3:29). He did not know who the petitioner was referring to. Id. The petitioner never said that he killed Scott Gomes. (Tr. 3:31). He said that the petitioner said that Scott Gomes tried to kill him, and that everytime he see Scott that he was going to [try] to kill him. Id.

On June 25, 2004, Derrick Winbush recanted his trial

---

8/ His identification of the petitioner is very suspect because he said he would not recognize him if he saw him on the street. Now, all of a sudden he sees more in fifteen seconds than he has ever seen in the past. This testimony sounds scripted.

testimony in an affidavit. Mr. Winbush states "When I
testify at the Grand Jury Hearing, and at the Trial against
Tyler, I was high from(2) Bags of Dope, and I had lied as
to all of the facts at each Hearing. The Police and D.A.
was aware and did rehearsed the testimony with me, on
different occasions, that my testimony would be believed."
Aff. of Derrick Winbush at ¶ 11. He said "At no time of
May 22, 1989. Did I see or speak with Derrick "Deke"
Younge, nor did I see the Murder of Scott Gomes or what
lead to his Murder, also I did not see him on that day,
or knew him other than what I was informed by the Police
in this case." Id, at ¶ 12.

Derrick Younge, a defense witness, testified that he
knew the defendant since they were little. (Tr. 3:83-84).
That prior to May 22, 1989, he did not see the petitioner
often. (Tr. 3:84). He stated that he also knew the victim,
Scott Gomes for a few years. (Tr. 3:85). On May 22, 1989,
earlier that day he saw the victim on Blue Hill Ave. in
a taxi. (Tr. 3:87). The taxi pulled over and he got into
the taxi with Scott Gomes. Id. They then went to Dale
Street together. (Tr. 3:87-88). The taxi arrived at Dale
Street and dropped them off at Dale and Regent Street.
(Tr. 3:88). Scott started walking towards Washington Park.
Id. Shortly afterwards, while Scott began walking back
towards him, he saw him flee from the scene and a whole bunch
of guys chasing him. (Tr. 3:90). There were between six and

-11-

'seven guys chasing him. (Tr. 3:91).  A lot of them were really
tall and had their back towards him so he could not see them
good. Id.  He knew the petitioner most of his life and the
petitioner was not in that group of men who were chasing
Scott Gomes. (Tr. 3:92).  About 3 to 5 minutes after the
group chased Scott Gomes into the housing complex, he
heard an anbulance and police going towards the scene.
(Tr. 3:94).  Being curious he went into the housing complex
and that is when he saw Scottie laying on the steps. Id.
He said that he never had a conversation with the petitioner
that evening. Id.  He did see Derrick Winbush that night.
Id.  He saw Derrick Winbush after Scott Gomes got stabbed.
(Tr. 3:96).  He said that he had a conversation with Mr.
Winbush and Mr. Winbush told him that he went down to the
police station and identified that he had seen who stabbed
Scott Gomes.  He told the police that if he could do
something for them, what could they do for him as far as
his case is concerned.  Mr. Winbush gave the police Mr.
Younge's name stating that Mr. Younge witnessed the stabbing.
Mr. Younge questioned why would he do such a thing.  And
Mr. Winbush said that he just wanted to get his cases
cleared by telling them Derrick Tyler (the petitioner) did
it. (Tr. 3:99).  Scott Gomes was a friend of his. (Tr. 3:
101).  But see Aff. of Derrick Winbush at ¶¶ 7-10.

## ARGUMENTS

I.   **THE PETITIONER PROCLAIMS "ACTUAL INNOCENCE" OF THE
     MURDER OF SCOTT GOMES WHEREAS HE RECEIVED NEWLY
     DISCOVERED EVIDENCE IN THE AFFIDAVITS OF TONY
     MURRELL AND DERRICK WINBUSH, AND, IN LIGHT OF THE
     NEW EVIDENCE, IT IS MORE LIKELY THAN NOT THAT NO
     REASONABLE JUROR WOULD HAVE FOUND HIM GUILTY
     BEYOND A REASONABLE DOUBT**

To satisfy Carrier's "actual innocence" standard, a
petitioner must show that, in light of the new evidence,
it is more likely than not beyond a reasonable doubt.
Schlup v. Delo, 513 U.S. 298,299 (1995).  The focus on
actual innocence means that a district court is not bound
by the admissibility rules that would govern at trial, but
may consider the probative force of relevant evidence that
was either wrongly excluded or unavailable at trial. Id.

### A.   The prosecutor knowingly and intentionally procured the perjured testimony of Tony Murrell and Derrick Winbush to convict the petitioner of first degree murder.

At the core of this issue is the fact that two witnesses
whose testimony were central and critical to this case,
has now recanted, and states that they were coerced into
providing such testimony at the time of trial.  Their
testimony, and the fact that their testimony has now been
recanted is of great significance to this case.

This was a case, which was based largely upon "circum-
stantial evidence."  There was no eyewitnesses who claimed
to see Mr. Tyler stab Mr. Gomes.  There was no compelling
forensic evidence linking Mr. Tyler to the stabbing of Mr.

-13-

Gomes. Without the testimony of Tony Murrell and Derrick Winbush, it is highly unlikely that Mr. Tyler would have ever been required to stand trial, let alone be convicted.

The testimony that was so critical in this case was the supposed "identification" of Mr. Tyler and that he possessed a "knife" on the day of the incident. In particular, Mr. Murrell testified that a blue Suzuki Sidekick pulled up and some guys jumped out and started chasing the victim (Scott Gomes). (Tr. 2:127). There were eight people chasing him. Id. All of the guys, including the defendant, had knives. (Tr. 2:136,174). He said they chased Mr. Gomes into O'Bierne Place and he lost sight of them. (Tr. 2:133). When they came back out, he saw a knife in the defendant's hand. (Tr. 2:136,137). However, in his affidavit, he makes a full recantation of his trial testimony when he says, "I come now to recant my testimony and honestly say that my testimony against Derick Tyler was false, and the police and trial prosecutor knew that." Aff. of Tony Murrell at ¶ 3. He told the police "I don't know Derick Tyler or what he looks like." Aff. of Tony Murrell at ¶ 4. After showing him a photo of Mr. Tyler, id., at ¶ 5, "The detectives," he said, "then brought up my pending outstanding criminal charges and told me that I will either help them by indentifying Mr. Tyler as being a part of the group or I will be facing a long prison sentence." Aff. of Tony Murrell at ¶ 6. He said, "I lied to the grand jury and at his trial

-14-

because the detectives and the districtattorney forced me
to; and I am now trying to right a wrong." Aff. of Tony
Murrell at ¶ 13.

Derrick Winbush testified that there were six men
chasing the victim. (Tr. 2:201). He then heard "Deek" yell,
"Derrick,Derrick,Derrick." (Tr. 2:203). He testified
that the defendant stopped in front of him and said to
Deek, "What the fuck you calling my name for; What was
you yelling my fucking name for." (Tr. 2:206). He said
the [petitioner] further said, "Man, fuck that man. Every
time I see that motherfucker, I'm going to try to kill
him. He tried to kill me." Id. He said the petitioner
had a knife in his handa with "blood" on it. (Tr. 2:207).
In an affidavit, Mr. Winbush recants his testimony by
saying that, "When I testify at the Grand Jury Hearing,
and at the Trial against Tyler, I was high from (2) Bags
of Dope, and I had lied as to all of the facts at each
Hearing. The Police and D.A. was aware and did rehearsed
the testimony with me, on different occasions, that my
testimony would be believed." Aff. of Derrick Winbush
at ¶ 11. He said, "At no time of May 22, 1989. Did I
see or speak with Derrick "Deek" Younge, nor did I see
the Murder of Scott Gomes or what lead, to his Murder,
also I did not see him on that day, or knew other than
what I was informed by the Police in this case." Aff. of

-15-

Derrick Winbush at ¶ 12.  So looking at  this evidence, when

Mr. Winbush originally testified that he heard [Deke] yell

the petitioner's name three times, and that Mr. Tyler said

"What the fuck you yelling my name for. . ." after approaching

him and [Deke], was actually false.  Mr. Younge's testimony

also corroborates Mr. Winbush's affidavit that the events

never took place as Winbush originally testified to.

Mr. Winbush goes on to say, "At all times the District

Attorney in this case was aware of the promises of a deal

in my pending cases, in exchange for testimony and knew of

the Police assisting me to properly testify against Tyler."

Aff. of Derrick Winbush at ¶ 10.

Both witnesses recantations reveal some very disturbing

facts about prosecutorial and police misconduct to the

highest degree.  As to the force of the affidavits themselves,

a judge must take a recantation seriously, but may weigh

its credibility and force.

It is fundamental that the prosecutor may not base its

case upon perjured testimony.  The Massachusetts and Federal

Constitution prohibit a prosecutor from standing mute when

a witness gives testimony that the prosecutor knows, or

has reason to know, is false. See Mooney v. Holohan, 294

U.S. 103 (1935); Commonwealth v. Collins, 386 Mass. 1,10

(1982); Napue v. Illinois, 360 U.S. 264,266 (1959);

Alcorta v. Texas, 355 U.S. 28 (1957).  The courts have

consistently held that a conviction obtained through false

-16-

testimony is fundamentally unfair, and must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." See United States v. Agurs, 427 U.S. 97,104 (1976); Accord Kyles v. Whitley, 514 U.S. 419, & n. 7 (1995).  See also United States v. Bagley, 473 U.S. 667,682 (1985).  Denial of due process exists where false testimony goes uncorrected. Napue v. Illinois, 360 U.S. 264,269 (1959).  "Regardless of whether the government has encouraged the false evidence of one of its witnesses, the prosecutor must advise the court of such false testimony." Commonwealth v.  Hill, 432 Mass. 704,714, 739 N.E.2d 670 (2000).

A conviction based upon false testimony, especially if such testimony is coerced by the prosecution and police alike, would deprive a petitioner of a fair trial, the right to confrontation, and the right to due process of law, all in violation of the 14th Amendment to the United States Constitution.

In this case, Mr. Tyler was deprived of his right to confront the two chief witnesses against him, Mr. Murrell and Mr. Winbush, because he was not provided with the full extent of statements by these witnesses, which would have tended to show that the alleged "identification" of Mr. Tyler at the scene with a knife was a product of coercion, and intentional tailoring of evidence so as to inculpate Mr. Tyler.  The Confrontation Clause is applicable to the

-17-

States.  As the Supreme Court noted in Pointer v. Texas,
380 U.S. 400,404 (1965), it "cannot seriously be doubted
at this date that the right of cross examination is included
in the right of an accused." See Kirby v. United States,
174 U.S. 47 (1899); Alford v. United States, 282 U.S. 687
(1931); Greene v. McElroy, 360 U.S. 474 (1959);
In re Oliver, 333 U.S. 257 (1948); Turner v. Louisiana,
379 U.S. 466 (1965).  The Supreme Court has repeatedly
expressed the principle that "the right of confrontation
and cross examination is an essential and fundamental
requirement for the kind of fair trial which is this
country's constitutional goal." Pointer, supra, at 405.

According to the affidavit of Mr. Murrell, his
testimony was coerced by the prosecutor because he said,
"Before going to the grand jury, I informed the prosecutor
that although my statement says I know Mr. Tyler, I
didn't know him at all.  The prosecutor said to me not to
worry.  Just tell the story that you knew him most of
your life." Aff. of Murrell at ¶ 9.  "So I told the grand
jury the lies that I saw Derick Tyler in the group with
a knife as "the main one" and that he was easily identifi-
able because I knew him most of my life." Aff. of Murrell
at ¶ 10.

The prosecutor never revealed to the defense that the
statements and testimony were obtained in a coercive

-18-

manner. Nor would the petitioner expect the prosecutor to reveal such a manifest injustice. He was trying to convict the petitioner at all cost. If such statements were, in fact, coerced, evidence relating to the manner in which statements were obtained from these witnesses was exculpatory, and Mr. Tyler was unconstitutionally denied access to this exculpatory evidence. See Brady v. Maryland, 373 U.S. 83,87; Kyles v. Whitley, 574 U.S. 419; Commonwealth v. Martin, 427 Mass. 816,824, 696 N.E.2d 904 (1998).

The evidence from Mr. Murrell and Mr. Winbush, which has now been recanted, was in a very real sense the keystone of the government's case. The prosecutor's case was circumstantial, and was "particularly vulnerable to even slight blows" to the credibility of the witnesses, or to their motivations in testifying. Without Mr. Murrell's or Mr. Winbush's testimony, then the testimony of Dana Fisher, supra at pp. 4-6, becomes not only more critical, but immensely more vulnerable to cross examination and impeachment. Moreover, the prosecutor capitalized off of the lies in his closing arguments.

## PROSECUTOR'S CLOSING ARGUMENTS

"And ask yourself which would be harder, would it be harder for someone to come in who had a reason to lie? And, if they had a reason to lie, wouldn't they come in and say, I know Derrick Tyler. I've known him all my life. I saw him

-19-

with a knife, and I saw him stab Scott Gomes.
Wouldn't that be the easy lie to tell?" (Tr. 4:27)

"Tony Murrell. Perhaps you might find he was not
terribly articulate or terribly bright. He got
confused at times. He had some trouble. But
does that mean he is lying? On the contrary.
Doesn't that mean perhaps he hasn't got the
wherewithal to make up a story? Isn't he, on
the other hand, trying to figure out where
that all fits in with everybody else, just
trying to tell you what he saw? And what he
told you he saw was Derrick Tyler run with a
knife into the housing complex and Derrick
Tyler run out of the housing complex with a
knife." (Tr. 4:28)

"Derrick Winbush. He told you what he heard
and what he saw. He saw Derrick Tyler with a
knife covered with blood, the knife in his
hand." (Tr. 4:28)

"I suggest he (Derrick "Deek" Younge) makes up
a story about Derrick Winbush that I suggest
has no believability to it. If Derrick Winbush
wanted something from the Commonwealth — and
maybe he did — wouldn't he come in and say,
I saw Derrick Tyler, I saw him stab Scottie
Gomes? A very simple story. But he didn't. Again,
he's part of the jigsaw puzzle, if you will,
the pieces that fit together." (Tr. 4:29)

For example, the prosecutor said, "Tony Murrell.

Perhaps you might find he was not terribly articulate or

terribly bright. He got confused at times. He had some

trouble. But does that mean he is lying?" (Tr. 4:28).

The answer to this question would be yes. Based on the

contents cf his affidavit, it is easily perceivable why

"he had trouble." He had trouble because he was trying

to make sure he remember the lies he was told to tell

by the prcsecutor and police. Then the prosecutor goes

-20-

on to say, "Derrick Winbush. He told you what he heard and
what he saw. He saw Derrick Tyler with a knife covered
with blood, the knife in his hand." (Tr. 4:28). We now
know, according to Mr. Winbush's affidavit, that this is
untrue because he says he "did not see [Mr. Tyler] on
that day, or knew him..." Aff. of Winbush at ¶ 12. The
prosecutor's actions here "so infect[s] the trial with
unfairness as to make the resulting conviction a denial
of due process." Jenkins v. Artuz, 294 F.3d 284, 292
(2nd Cir. 2002)(quoting Darden v. Wainwright, 477 U.S.
168 (1986)). The prosecutor here clearly misrepresented
the facts. See U.S. v. Mason, 293 F.3d 826,829-830 (5th
Cir. 2002)("By failing to correct the misrepresentation,
we find that the government violated Mason and Smith's
rights to due process under the Fourteenth Amendment").

By failing to inform the defense that Murrell and
Winbush were coerced to tailor their testimony, and that
"deals" were made for their testimony, the prosecutor
violated the duty to inform the defense of material
exculpatory evidence. Brady v. Maryland, 373 U.S. 83,
87 (1963).

By allowing the Detectives, Tony Murrell and Derrick
Winbush to testify under false pretenses, he violated
the duty to correct false evidence when it is offered.
Napue v. Illinois, 360 U.S. 264,269 (1959). Finally,

-21-

by arguing to the jury that the witnesses, Murrell and Winbush were telling "the truth" and had no reason "to lie," violated the duty not to argue false or inadmissible evidence to the jury. Miller v. Pate, 386 U.S. 1 (1967).

The proper role of the criminal prosecutor is not simply to obtain a conviction, but to obtain a fair conviction. The prejudice to the petitioner's right to a fair trial is even more palpable when the prosecutor has not only withheld exculpatory evidence, but has knowingly introduced and argued it false. The fact that Murrell and Winbush has recanted their testimony is very much material, and undermines confidence in the verdict. Accord Curran v. Delaware, 259 F.2d 707,713 (1958)("the knowingly false testimony of Detective Rodenheiser under the circumstances of the case at bar was sufficient to cause the defendant's trial to pass the line of tolerable imperfection and fall into the field of fundamental un-fairness"); Sanders v. Sullivan, 863 F.2d 218, _____ (2nd Cir. 1988)("if [the] Agent ... did in fact give false information as alleged to the district court [regarding the petitioner's prior convictions], then the defendant's sentence would be lacking in due process...."); Burks v. Egeler, 575 F.2d 221,227 n. 4 (6th Cir. 1975)("police are very much a part of the State and its prosecutorial machinery"). See also Watkins v. Miller, 92 F.Supp.2d 824 (S.D.Ind 2000), and cases cited therein.

-22-

This is the appropriate case where comity and finality 'must yield to the imperative of correcting a fundamentally unjust incarceration.' Schlup, 513 U.S. 320,321. The affidavits are quite disturbing because Murrell and Winbush not only admit that they gave false testimony, but that the prosecutor and police are the ones who told them to lie. If this information would have been available during the petitioner's trial, there is a "'fair probability,'" that "'the trier of the facts would have entertained a reasonable doubt of his guilt.'" Schlup, at 332, quoting Murray v. Carrier, 417 U.S., at 454,455, n. 17. There was no physical evidence or forensic evidence connecting the petitioner to the crime with which he was charged. The only evidence was through the testimony of Tony Murrell and Derrick Winbush, who, has now come forward and admit that they lied. This estbalishes that the petitioner is actually innocent of the crime. And because of this showing, it is more likely than not that "no reasonable juror" would have convicted him. He should be granted the writ and released form custody. He has shown on the record that he is entitled to that relief.

II.   **THE MASSACHUSETTS COURTS DECISIONS WAS CONTRARY TO, OR INVOLVED AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS DETERMINED BY THE SUPREME COURT WHEN DENYING PETITIONER'S ISSUE THAT THE JURY INSTRUCTIONS PERMITTED AN INFERENCE OF MALICE ON LESS THAN A PLAIN AND STRONG LIKELIHOOD OF DEATH, WHICH WAS IMPROPER BECAUSE THE TRIAL JUDGE'S CHARGE ON "THIRD PRONG MALICE" AS IT RELATES TO THE 'GRIEVOUS BODILY HARM' LANGUAGE WAS UNCONSTITUTIONAL**

The Appeals Court for the Commonwealth of Massachusetts reversed a second degree murder conviction in Commonwealth v. Azar, 50 Mass. App. Ct. 767 (2001), further review denied, 412 Mass. 1105 (2001), because the jury instructions permitted an inference of malice on less than a plain and strong likelihood of death. Since the issue was raised for the first time in a motion for new trial, the trial judge ruled that it was waived. Id. at 767-768. The Court of Appeals reversed, holding that the jury instruction was flawed and that the defective charge created a sub-stantial risk of a miscarriage of justice. Id. at 769-770.

At the conclusion of the trial in Azar, the jury was instructed:

> "To prove malice, the government must prove beyond a reasonable doubt one of the three things: either, that [the defendant] acted intending to kill [his daughter]; or that he acted intending to cause her grievous, that is serious, bodily harm; or that he intended to do an act creating a strong and plain likelihood, in light of normal human experience, that death or grievous, that is, serious, bodily harm would result to [his daughter]." (emphasis added).

Id. at 768.

According to the Appeals Court, the underlined portion

-24-

of the instruction (referred to as "third prong malice")
was indisputably erroneous because "'[t]he third prong
of the malice definition can only be satisfied by proof
that 'there was a plain and strong likelihood of death.''"
Id. at 768-769. (citations omitted).  As the Court of
Appeals explained: "Intending to do an act creating a strong
likelihood of grievous bodily harm does not constitute
malice." Id. (emphasis added).  Absent malice, "'an
unlawful killing can be no more than manslaughter.'" Id.
( citation omitted).

The Supreme Judicial Court has held that a murder
conviction "founded on a state of mind sufficient only to
support a manslaughter conviction violates due process."
Commonwealth v. Vizacarrando, 427 Mass. 392,396-397 (1998).
Such a conviction also violates the constitutional mandate
of administering punishment in proportion to an individual's
moral culpability. Id. at 397. See also Carella v. California,
109 S.Ct. 2419,2421 (1989)("In that event the erroneous
instruction is simply superfluous: the jury has found in
Winship's words, 'every fact necessary' to establish every
element of the offense beyond a reasonable doubt").
(emphasis added).

Mr. Tyler's jury was instructed that it could return
a murder conviction based on a plain and strong likelihood
of grievous bodily harm, and not necessarily death.  The

charge includes the following definitions of malice:

> "Malice aforethought includes any unexcused specific intent to kill, any unexcused specific intent to do grievous bodily harm or any unexcused intent to do an act creating a plain and strong likelihood that death or grievous bodily injury will follow that act."
> (Tr. 4:61).

> "Malice aforethought may be inferred if in the circumstances known to the defendant a reasonably prudent person would have known that according to common experience there was plain and strong likelihood that death or grievous bodily harm would follow the contemplated act." (Tr. 4:61).

Here, the trial judge clearly erred in his charge to

the jury on third prong malice. This error was compounded

by the judge in his charge to the jury on second degree

murder when he gave the following definition on malice:

> "Malice aforethought includes any unexcused, specific intent to kill, any unexcused specific intent to do grievous bodily harm, or any unexcused intent to do an act creating a plain and strong likelihood that death or grievous bodily harm will follow." (Tr. 4:68).

> "Malice aforethought may be inferred by a jury—again, it doesn't have to be but it may be — if in the circumstances known to the defendant a reasonably prudent person in those circumstances would have known that according to common experience there was a plain and strong likelihood that death or grievous bodily injury would follow the con-templated act." (Tr. 4:68).

It was not like the judge gave the errant "grievous

bodily harm" language out of context one time in his charge.

He made several references to the language in both his

first degree murder and second degree murder charge, respectively.

'The judge does not cure the infirmity in his initial charges
and the Due Process Clause of the Fourteenth Amendment
"protects the accused against conviction except upon proof
beyond a reasonable doubt of every fact necessary to
constitute the crime with which he is charged." Francis
v. Franklin, 105 S.Ct. 1965,1970 (1985).  The instruction
had the effect of relieving the State of the burden of
proof enunciated in In re Winship, 90 S.Ct. 1068 (1970),
on the critical question of state of mind.

Since the charge permitted a reasonable juror to infer
malice on less than a plain and strong likelihood of
death, it was erroneous.  The only issue that remains is
whether the flawed instruction created a fundamental
miscarriage of justice.  Based on the evidence presented
at trial in this case, the risk that the jury relied on
the erroneous charge is inescapable.

According to the trial testimony of the Commonwealth's
witnesses, the incident leading to Scott Gomes injury
occurred when the petitioner and six other men saw the
victim and chased him up Dale Street into the housing complex
at Crispus Attucks Way. (Tr. 2:132,200).  Marie Winbush
testified that when she came home from work that she had
eventually looked out her kitchen window and saw a bunch
of men huddled over a person making punching motions.
(Tr. 2:71-73).  When the group of guys noticed her they

-27-

'ran away. (Tr. 2:73). She was unable to identify the peti-
tioner as being a part of the group of men involved in
assaulting Scott Gomes. (Tr. 2:76). On the other hand,
Tony Murrell (Tr. 2:136,137), and Derrick Winbush (Tr. 2:
207), both prosecution witnesses, testified that the
petitioner had a knife in his hand. But this can be
highly disputed based on many factors. In particular,
each witness does not know the petitioner, and Mr. Winbush
would have not known him if he passed him on the streets
prior to trial.

Also, there was evidence that the petitioner's action
was premised on a heat of passion based on the fact that
the victim tried to kill him before in a prior incident.
And the evidence can easily be inferred that the petitioner
was not looking to kill Scott Gomes that day but that when
he did see him, just brought out angered passions and fears
based on prior events of the victim attempting to kill
him in some manner.

As in Azar and Vizcarrando, the evidence in the instant
case could have "'warranted a finding of risk of harm less
than a strong likelihood of death.'" Vizcarrando, 427 Mass.
at 397 (citations omitted). Based on the testimony of
Tony Murrell and Derrick Winbush, the blow causing the
injury was never witnessed by either party. Nor did the
actual eyewitness to the actual assault, Marie Winbush,

-28-

' could tell "who" delivered the fatal blow to the victim.
No murder weapon was ever recovered which could positively
identify the petitioner as the assailant.  Under these
circumstances, a reasonable juror might well have believed
that the blow allegedly administered by Mr. Tyler created
a plain and strong likelihood of grievous bodily injury,
but not necessarily death.

In a criminal trial in this country, it is an elementary
principle of due process that every element of the crime
must be proven by the prosecution beyond a reasonable
doubt. Sandstrom v. Montana, 442 U.S. 510,520 (1979).
An instruction that tells a jury to presume any element
of a crime without evidence is unconstitutional, for "the
Fourteenth Amendment's guarantees prohibit a State from
shifting to the defendant the burden of disproving an
element of the crime charged." Id., 442 U.S. at 527.
A mandatory rebuttable presumption is equally unconsti-
tutional. Francis v. Franklin, 471 U.S. 307,317 (1985).

The petitioner was tried on first degree murder and
was convicted based on these erroneous instructions.
This Court cannot honestly say that the errant charge did
not play a role in his conviction for first degree murder —
because if malice is not established in a first or second
degree murder charge, then the petitioner can be found
guilty of no greater charge than manslaughter.  Federal

-29-

review  of this claim is necessary to prevent a fundamental
miscarriage of justice, Reed v. Ross, 468 U.S. 1 (1984),
because the judge's errant charge may have been the
difference between the petitioner being found guilty of
manslaughter since the Commonwealth was relieved of proving
an essential element against the petitioner due to the
judge's errant charge on malice which "undermines confidence
in the fundamental fairness of the state adjudication. . ."
Williams v. Taylor, 120 S.Ct. 1495, 1503 (2000).  The writ
should issue on this matter.

### III.  APPELLATE COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO ARGUE THE ERRANT REASONABLE DOUBT INSTRUCTION ON DIRECT APPEAL DENYING THE PETITIONER'S RIGHT TO EFFECTIVE APPELLATE COUNSEL

The accused's right to have a jury, not a court, decide
guilt or innocence by the standard of proof beyond a
reasonable doubt sharply limits the availability of harmless error
review of an erroneous reasonable doubt instruction.
Where, as here, factual guilt is contested, any harmless
error analysis would require judicial fact-finding and thereby
violate the right to trial by jury.

The right to trial by jury is the right to make the
Government s evidence and the truth of its accusations tested
and weighed by ordinary citizens, not by judges or other
appointees of the Government.  The right is ultimately the
single most powerful bulwark placed on the founding fathers

between the powers of the Government and the freedom of the individual. Duncan v. Louisiana, 391 U.S. 145 (1968). Its denial can never be harmless. The corollary of the right is that judicial fact-finding violates the right to trial by jury.

The fundamental measure by which juries find facts and determine the "truth" of a Government accusation is the standard of proof beyond a reasonable doubt or it is not found at all. A jury verdict returned on a standard short of proof beyond a reasonable doubt is a verdict without constitutional significance. In re Winship, 397 U.S. 358 (1970).

The right to trial by jury and the standard of proof beyond a reasonable doubt combine the rule that the task of determining the "truth" of the Government's accusation to the requisite certainty is constitutionally reserved to the jury. Those considerations necessarily constrict any possibility of applying harmless error analysis to a flawed reasonable doubt instruction that leaves a jury verdict devoid of any constitutionally cognizable jury fact-finding. The United States Supreme Court has consistently recognized that a jury finding reached beyond a reasonable doubt is so fundamental that its absence cannot be harmless. Cases from United Brotherhood of Carpenters v. United States, 330 U.S. 395 (1947), through Yates v. Evatt, 111 S.Ct. 1884 (1991), acknowledge that appellate fact-finding cannot

-31-

substitute for a failure of the jury to find facts beyond
a reasonable doubt without doing violence to the constitu-
tional imperative that guilt can be determined only by a
jury.

   The reasonable doubt instruction possesses all the
questions that, under  Fulminante opinions, excludes
it from harmless error review. See Arizona v. Fulminante,
111 S.Ct. 1246 (1991).  A reasonable doubt instruction
that correctly insures that a jury will convict only on
the degree of proof required by due process is an integral
part of the structural guarantee of trial by jury.   It
is the basic protection without which a criminal trial
fails at its function of enabling juries to find the truth.
The reasonable doubt instruction is the mechanism by
which juries function.   To allow that function to be
supplanted by courts is to destroy the meaning of trial
by jury and the right to jury fact-finding.

   An erroneous reasonable doubt instruction prevents
a jury from fulfilling its truth-finding task in the only
way permissible — by proof beyond a reasonable doubt.
It leaves a record empty of any jury findings of constitu-
tional  certainty.   There can be no assurance that the
jury determined anything to the required certitude.   It
is quite distinct from an unconstitutional burden-shifting

presumption, which may be subject to harmless error review.
Though such presumptions affect the jury's truth-finding
task, the jury still functions to find predicate facts
beyond a reasonable doubt, against which facts the harm-
lessness of the error can be judged.

Whatever room may otherwise exist for harmless error
analysis, it has no place here.  The judge, in the instant
case, gave the jury the following flawed reasonable doubt
instruction:

>"What do we mean by proof beyond a reasonable
>doubt? And, again, that is a phrase that I am
>sure you may have heard before. But, again, it
>is a very real proposition of law that requires
>a definition and an understanding by the jury.
>And let me take a moment, if I can, to read you
>the definition that we use of that concept,
>proof beyond a reasonable doubt. More precisely,
>this is a definition of what is reasonable
>doubt. And what is reasonable doubt? It is [a]
>term often used, probably pretty well understood,
>but not so easily defined. It is not mere pos-
>sible doubt, because everything relating to
>human affairs **and depending on moral evidence**
>is open to some possible or imaginary doubt.
>It is that state of the case which after the
>entire comparison and consideration of all of
>the evidence leaves the minds of jurors in
>that condition that they cannot say they feel
>an abiding conviction to a moral certainty of
>the truth of the charge.
>
>The burden of proof is upon the prosecutor. All
>presumptions of law, independent of evidence,
>are in favor of innocence; and every person
>is presumed to be innocent until he is proved
>guilty. If upon such proof there is a reasonable
>doubt remaining, the accused is entitled to
>the benefit of it by way of an acquittal, for
>it is not sufficient to establish a probability,
>though a strong one arising from the doctrine

of chances, that the fact charge is more likely to be true than the contrary. But the **evidence must establish the truth of the fact to a reasonable [and] a moral certainty, a certainty that convinces and directs the understanding and satisfies the reason and judgment of those of you;** that is, the jury, who bound to act conscientiously upon the evidence. This we take to be proof beyond a reasonable doubt.

Now, ladies and gentlemen, if you follow that definition of reasonable doubt, I am sure you can understand that in that context reasonable doubt does not mean proof beyond all doubt. It does not mean proof to a mathematical certainty. But it clearly means proof, certainly, beyond surmise or conjecture or speculation or some doctrine of probabilities and chances. What it does mean, again, to repeat, proof beyond a reasonable doubt in that definition **is proof to [a moral certainty], a certainty that convinces and directs [your understanding] and satisfies your reason and judgment."** (Tr. 4:35-37)

Here the trial judge committed reversible error in many instances when giving the instruction. First, when the judge said that "everything relating to human affairs <u>and</u> [depending on moral evidence] is open to some possible or imaginary doubt," (Tr. 4:36(, is clearly improper and detrimental to the defendant's case. Because this particular phrase implies to the jury that the evidence is to be judged "morally" and not "factually" (which is constitutionally required) because for one to judge evidence "morally" is to judge it from an indivdual aspect and belief instead of from the evidence and the law.

Also, he did more violence to the constitutional imperative of the charge when he stated that "the evidence <u>must</u> establish the truth of the fact to a reasonable [and] a moral certainty, a certainty that convinces and directs the understanding and satisfies the reason and judgment

, of those of you." (Tr. 4:36-37).  When he states "and a
moral certainty," he is telling the jury that they are
to base their deliberation and verdict from what they
feel is "morally right" and not from an evidentiary and
fact-finding function (where the constitution compels).
From this standpoint, alone, the instruction is seriously
flawed.  The instruction is incomplete and was not fully
explained to the jurors to "unconfuse" the jurors' minds.
See Victor v. Nebraska, 114 S.Ct. 1239 (1994).  He further
exacerbates the problem by stating that, "proof beyond
a reasonable doubt in that definition is [proof to a moral
certainty]. . ." (Tr. 4:37).  In Victor, the court said
"What once might have made sense to jurors has long since
become archaic." Victor, 114 S.Ct. at 1251 (Kennedy, J.,
concurring).  The judge's flawed instructional definition
did nothing to unconfuse the jurors' minds about the
instruction and it "plainly informs the jurors that the
prosecution must prove its case by more than a mere pre-
ponderance of the evidence, yet not necessarily to an
absolute certainty." Victor, 114 S.Ct. at 1252-1253 n*
(Ginsburg J., concurring opinion).

        The charge, as given, "failed to convey the critical
point that. while absolute certainty is unnecessary, a
belief in guilt at least approaching absolute certainty
was required." Lanigan v. Maloney,  853 F.2d 40,47 (1st

                              -35-

Cir. 1988).  That was not done here.  Instead, he states

that reasonable doubt "does not mean proof beyond all

doubt.  It does not mean proof to a mathematical or to a

scientific certainty." (Tr. 4:37).  In this matter, "the

judge never discussed why it was important to require

a very high standard of proof." Lanigan, supra.  Thus,

the jurors may weel have been left with an impression that

any amount of persuasion — i.e., anything beyond guess-

work or conjecture — properly could constitute sufficient

"moral certainty" to support a guilty verdict." See also

Commonwealth v. Labriola, 430 Mass. 569, 570-571 n. 3,

722 N.E.2d 13 (2000)(stating that errors in a reasonable

doubt instruction which allows a jury to convict the

defendant on a burden of proof less than beyond a reason-

able doubt necessarily require a new trial regardless

of whether review is direct or collateral); Commonwealth

v. Gagliardi, 418 Mass. 562,568 (1994)(despite waiver,

constitutionally deficient instructions on reasonable

doubt that permit a jury to convict a defendant on proof

less than proof beyond a reasonable doubt create a sub-

stantial miscarriage of justice).

Here appellate counsel was clearly ineffective because

this issue was properly preserved for appellate review

and must have leaped out upon even a casual reading of

the transcript because defense counsel clearly objected

to the errant language of the reasonable doubt instruction.
See (Tr. 4:81-82). The Fourteenth Amendment guarantees
a criminal[defendant] pursuing a first appeal as of right
certain minimum safeguards necessary to make that appeal
"adequate and effective." Evitts v. Lucey, 105 S.Ct. 830,
834 (1985)(citation omitted and emphasis added). The
standard for ineffective assistance is the same for trial
and appellate counsel. Matire v. Wainwright, 811 F.2d
1430,1435 (11th Cir. 1987). An accused is constitutionally
entitled to the effective assistance of counsel on a
direct appeal as of right. Evitts v. Lucey, supra;
Lombard v. Lynaugh, 868 F.2d 1475,1479 (1989); Gray v.
Greer, 800 F.2d 644 (7th Cir. 1985); Murray v. Carrier,
106 S.Ct. 2639 (1986). "Because the right to counsel is
so fundamental to a fair trial, the constitution cannot
tolerate trials in which counsel, though present in name,
is unable to assist the defendant to obtain a fair
decision on the merits." Evitts, 105 S.Ct. at 836.
The petitioner contends that he was not fairly represented
on his direct appeal because counsel left out this
meritorious claim which was "obvious on the record and
must have leaped out upon even a casual reading of the
transcript." His inactions denied the petitioner his
constitutional rights to a first appeal as of right.

The instruction used here may require a higher degree
of jury certainty than the mere preponderance standard,

but a verdict based upon it nevertheless lacks the assurance
that the constitution compels.  Such a verdict is entitled
to no greater respect than one obtained with no standard
whatsoever, for guilt, though it may not be ascerainable
with mathematical precision, is nevertheless an absolute
within our system of justice.  Citizens are not a little
bit guilty, mostly guilty, or substantially guilty.
They are either guilty beyond a reasonable doubt, or they
are not guilty at all.

   To give life to the guarantees of the Constitution,
the writ must issue in this matter.

IV.  **THE JUDGE'S MANSLAUGHTER INSTRUCTIONS WAS SO
     CONFUSING THAT THE JURORS WERE IMPEDED FROM
     FAIRLY CONSIDERING VOLUNTARY MANSLAUGHTER AS
     A POSSIBLE VERDICT AND WAS CONTRARY TO, OR
     INVOLVED AN UNREASONABLE APPLICATION OF CLEARLY
     ESTABLISHED FEDERAL LAW AS DETERMINED BY THE
     SUPREME COURT OF THE UNITED STATES**

   The Due Process Clause of the Fourteenth Amendment "protects
the accused against conviction except upon proof beyond a
reasonable doubt of every fact necessary to constitute the
crime with which he is charged." Francis v. Franklin, 471
U.S. 307,311 (1985)(citations omitted).  This "bedrock,
'axiomatic and elementary' [constitutional] principle,"
prohibits the State from using evidentiary presumptions
in a jury charge that have the effect of relieving the State
of its burden of persuasion beyond a reasonable doubt of
every essential element of a crime. Id.

   Here the judge's manslaughter instructions was so
confusing that the jury was impeded from fairly considering

-38-

' voluntary manslaughter as a possible verdict, and the
instruction on voluntary manslaughter created a fundamental
miscarriage of justice because the judge failed to instruct
that the Commonwealth bore the burden of proving absence
of "heat of passion induced by reasonable provocation"
beyond a reasonable doubt.

In the beginning of his charge to the jury, the judge
stated, "If the government proves an unlawful killing
without malice aforethought, then they cannot have a
conviction of murder." (Tr. 4:72). He then contradicts
this by saying, "But, if they proved an unlawful killing
without malice aforethought, then the jury has the right
"to consider" whether or not they are going to return a
verdict of manslaughter." Id. Since malice is the difference
between murder or manslaughter, Commonwealth v. Skinner,
556 N.E.2d 1014 (1990), it was error for the judge to
say if an unlawful killing without finding malice was
proved, then the jury has the right to "consider" finding
the petitioner guilty of manslaughter. Since the elements
of any murder by definition would not exist under these
findings, then the jurors would have no other option but
to either find the petitioner guilty of manslaughter or
not guilty at all.

The next error came when the judge was trying to
define "mitigating circumstances" and its function in the

-39-

voluntary manslaughter charge.  The judge said, "The crime
of manslaughter involves, ladies and gentlemen, certain
mitigating circumstances which I <u>have</u> outlined for you.
These mitigating circumstances operate to negate; that
is take away, the existence, if you will, of the element
of malice.  Thus, if mitigating circumstances are present,
the law provides that even though the defendant has com-
mitted an unlawful killing, the crime is manslaughter and
not murder." (Tr. 4:72-73).

First of all, this instruction is confusing and given
out of context because he never told the jurors actually
"what" mitigating circumstances are to be determined in
order to either find the petitioner guilty of manslaughter
or murder.  The petitioner contends that the instruction
improperly placed the burden of proving voluntary manslaughter
and its requirements on him, and thus violated his due
process rights under the Fourteenth Amendment to the United
States Constitution. See <u>Francis</u> v. <u>Franklin</u>, 471 U.S. 307
(1985); <u>Mullaney</u> v. <u>Wilbur</u>, 421 U.S. 684 (1974);
<u>Sandstrom</u> v. <u>Montana</u>, 442 U.S. 510 (1979).

In order to prove that the petitioner acted with malice,
the Commonwealth must prove beyond a reasonable doubt the
<u>absence</u> of certain mitigating circumstances.  That is
what the judge failed to convey to the jury which was a
constitutional requirement.  The judge was also to explain
that mitigating circumstances are circumstances which lessen

a defendant's culpability for an act. Nowhere in his charge

does the judge convey this critical point to the jury.

This was warranted not only under state law, but under

federal law because it sufficiently conveys to the jury

that manslaughter is a killing committed in "a sudden

transport of passion or heat of blood, upon a reasonable

provocation and without malice, or sudden combat "

Commonwealth v. McLeod, 477 N.E.2d 972,981 (Mass. 1985),

the mitigating circumstances required to prove manslaughter.

What was of equal importance for the judge to have

conveyed to the jury, but did not, was that the crimes

of murder and voluntary manslaughter require proof of

an unlawful killing, but the killing may be the crime

of voluntary manslaughter if it occurred under mitigating

circumstances so that the Commonwealth cannot prove beyond

a reasonable doubt that the petitioner acted with malice.

Moreover, he left out the fact that, in order to obtain

a conviction of murder, the Commonwealth must prove

beyond a reasonable doubt the absence of these mitigating

circumstances: 1) heat of passion upon a reasonable provo-

cation, and 2) heat of passion induced by sudden combat.

"In order to prove murder, it is the Commonwealth's

burden to prove beyond a reasonable doubt that the defendant

acted with malice, and that he acted without reasonable

provocation, or in the absence of sudden heat of blood or

passion, or that there is no causal connection between

the provocation, the passion, and the acts committed by the defendant.  Otherwise, the crime is manslaughter." Commonwealth v. McLeod, 477 N.E.2d at 981.  This fact was not adequately conveyed to the jury.

The judge also gave confusing and errant language in defining manslaughter in the following manner:

> "Manslaughter, for the purpose of this case,
> is an unlawful, intentional killing resulting
> from a sudden transport of the passions of
> fear, anger, fright, nervous excitement, or
> heat of blood when there is no time to deliber-
> ate and when such passion or heat of blood is
> produced by adequate or reasonable provocation
> and without malice or upon sudden combat that
> would have been likely to produce in an ordinary
> person an abnormal state of mind and actually
> did produce such a state of mind in the
> defendant." (Tr. 4:73)

Here is the problem with this part of the charge. When the judge says that manslaughter is an "unlawful, intentional killing resulting from a sudden transport of the passions of fear," creates a mandatory burden-shifting presumption on state of mind to the petitioner in violation of Sandstrom v. Montana, 442 U.S. 510 (1979).  The words "passion" and "fear" are distinctive criterias from an elemental standpoint that are to be proven as one of the mitigating circumstances.  But the comment "passions of fear" takes away its supposedly distinctive function and now becomes one meaning and confuses its distinctive function.

Another problem with that part of the charge is when the judge says that manslaughter is "such passion or heat

-42-

of blood is produced by adequate or reasonable provocation..."

Id.  The problem with this is the word "adequate" "or"

"reasonable provocation" and how it is used in this

context.  Provocation as defined in a voluntary manslaughter

cannot be "adequate" or "reasonable."  It is either

reasonable provocation which negates malice or heat of

passion induced by sudden combat.  The judge further failed

to convey the point that the provocation here must be

such that a reasonable person would have become sufficiently

provoked and did not cool off at the time of the killing.

This important factor was not explained to the jury.  Here,

the judge did not adequately define provocation and explain

that it negates a finding of malice.  The judge did not

state how provocation and malice are mutually exclusive.

Here, the charge is constitutionally insufficient and

impermissible. See Commonwealth v. Doucette, 462 N.E.2d

1084,1093 (Mass. 1984)("the charge constitutionally

sufficient because the judge adequately defined provocation

and explained that it negates a finding of malice").  The

reasons for the "causal connection" analysis is because

the killing must follow the provocation before there is

sufficient time for the emotion to cool and must be the

result of the state of mind induced by the provocation

rather than a pre-existing intent to kill or injure. Accord

Commonwealth v. Berry, 727 N.E.2d 517,524 (Mass. 2000)

(One of the mitigating circumstances that would render

the crime a voluntary "manslaughter. . .[is] a killing
from a sudden transport of passion or heat of blood, upon
a reasonable provocation and without malice, or upon sudden
combat").

More confusing and inappropriate language came in
following manner when the judge stated, "The factor that
distinguishes voluntary manslaughter from murder is not
the absence of intent but, rather, the absence of malice
aforethought.  So, in order to prove the defendant guilty
of manslaughter, the Commonwealth must prove three elements
beyond a reasonable doubt; First, that the defendant in-
flicted an injury from which the victim died; Secondly,
that the defendant injured the victim as a result of
sudden combat or in the heat of passion and that the homicide,
the killing, was committed unlawfully without any legal
excuse or justification." (Tr. 4:73-74).

The problem with this part of the charge is in the
second of the three elements where he says the defendant
"injured the victim."  This part of the charge lessened
the burden the Commonwealth was required to establish
beyond a reasonable doubt in violation of his 14th Amendment
right to due process.  A necessary aspect of the right to
a jury trial is that every fact essential to conviction
of an individual must be proved beyond the jury's reasonable
doubt. In re Winship, 397 U.S. 364,    ,    (Quoting
Davis v. United States, 160 U.S. 469,484,493 (1895)).

-44-

The proper way the second element should have been
conveyed to the jury is that "the defendant intentionally
killed the victim as a result in the heat of passion
induced by sudden combat;" not, as he said, "the defendant
injured the victim as a result of sudden combat or in the
heat of passion."  The word "injured" is where the words
"intentionally killed" should be indicating the victim's
death because "injuring" someone does not necessarily
mean that the petitioner caused  the victim's death from
a manslaughter standpoint.  However, if the judge would
have said 'an intentional killing of the victim,"
which is a necessary element to find manslaughter —
would have been the proper way to define this instruction.
He was also to use in conjunction with the "intentional
killing" language that the petitioner did so with "reason-
able provocation."  This is an errant instruction.  The
"jury instruction had the effect of relieving the State
of the burden of proof enunciated in Winship on the
critical question of. . .state of mind, by creating a
mandatory presumption of intent upon proof by the State
of other elements of the offense."  Federal review of this
claim is necessary to prevent a fundamental miscarriage
of justice. Reed v. Ross, 468 U.S. 1 (1984),because it
is evident from a review of the entire instructions to
the jury on the crime of what constitutes voluntary

-45-

manslaughter, that the trial court's instructions on the concept of "heat of passion" and "provocation" were not correct, and hence does create a fundamental miscarriage of justice.

The next error came when the judge stated, "Physical contact, even a single blow between the defendant and the victim, may amount to adequate provocation. However, you may conclude that the physical contact, if any, even when initiated by the victim, if that's the case, was not adequate provocation." (Tr. 4:74-75). The problem here is with the word "adequate" and how it is used. "Adequate" is not the word to be used in the context of establishing provocation in a manslaughter context. Because any established provocation must be "reasonable" not "adequate." This part of the charge is wrong and constitutionally impermissible. The proper way to have given this charge was to say, "Physical contact, even a single blow may amount to 'reasonable' provocation." The judge should have then further expounded to the jury that whether the contact is sufficient will depend on whether a reasonable person under similar circumstances would have been provoked to act out of emotion rather than reasoned reflection. Without these words, how could the petitioner receive a fair trial as it relates to manslaughter? Moreover, the judge should have explained that the heat of passion

-46-

must also be sudden; that is, the killing must have occurred
before a "reasonable" person would have regained control
of his emotions.  This fact was not explained to the jury.
The judge was to then had sum this up by saying that if
the Commonwealth has not proved beyond a reasonable doubt
the absence of heat of passion induced by sudden combat,
the Commonwealth has not proved malice.

The next error came as follows: "The killing does not
have to be done spontaneously with the provocation in
order to be done in the heat of passion.  Where there is
evidence of provocation, the Commonwealth, of course, has
the burden of proving beyond a reasonable doubt that the
defendant did not act in the heat of passion before they
can expect you to convict the defendant of the crime of
murder." (Tr. 4:75).  The problem here is where the word
"provocation" is given out of context.  "Heat of passion"
should be where "provocation" is because where there is
evidence of "heat of passion" not "provocation," the
Commonwealth must prove beyond a reasonable doubt the
petitioner did not act in the "heat of passion."  And the
judge did not instruct the jury at all that the Commonwealth
had the burden of proving beyond a reasonable doubt
every essential element of the crimes charged.

Here the errors in this instruction relieved the State
of its burden of persuasion on an element of an offense

-47-

(voluntary manslaughter), and looking at the charge as a whole, created an unconstitutional presumption." See Cupp v. Naughten, 414 U.S. 141,147 (1973).

The writ should issues on this matter.

### V. THE AFFIDAVIT OF DERRICK WINBUSH RECANTING HIS TRIAL TESTIMONY ESTABLISHES THAT THE IDENTIFICATION OF DERICK TYLER WAS UNDULY SUGGESTIVE, AND TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PROPERLY INVESTIGATE, PRESENT, AND ARGUE THE IMPERMISSIBLE SUGGESTIVENESS OF THE IDENTIFICATION PROCEDURES

Pretrial identification evidence is subject to constitutional limitations under the Due Process Clause. U.S. v. Lopez-Lopez, 282 F.3d 1,10 (1st Cir. 2002) citing Stovall v. Denno, 388 U.S. 293,298-99 (1967); United States v. Watson, 76 F.3d 4,6 (1st Cir. 1996)(citing Manson v. Brathwaite, 433 U.S. 98 (1977)). Where identification evidence is at issue, however, no such special considerations justify a departure from the presumption that juries will follow instructions. It is the reliability of identification evidence that primarily determines its admissibility. Watkins v. Sowder, 449 U.S. 341,346 (1981)(citations omitted).

Here the petitioner contends that the identification procedures were unduly suggestive and the identification of the petitioner by Mr. Winbush was not reliable, and is now confirmed in his affidavit recanting his trial testimony.

On April 17, 1990, trial counsel filed a motion in

-48-

limine which alleged that the identification procedures
employed by the police in identifying the petitioner were
unnecessarily suggestive.  In furtherance of the motion,
trial counsel developed the following facts.

Derrick "Nate" Winbush testified that he went to
the police station on the night of the incident to view
a photo array. (Tr. 2:58-59).  While waiting to view the
photographs he first saw the petitioner's picture on a
bulletin board with several other photographs, which were
all on the wall in the area in which he had been seated
by the officers. Id.  The photographs were labelled with
names of neighborhood street gangs, such as "Castlegate,"
"Orchard Park," and "Intervale." (Tr. 2:58).  The petitioner's
photo was prominently displayed under the heading "Intervale."
Id.  Later, when viewing the photographic array, the police
indicated to Mr. Winbush the person whom they thought to
be Derick Tyler. (Tr. 2:59-60).  Mr. Winbush acknowledged
that the photograph he selected did not really look like
the person who he was trying to identify. (Tr. 2:60).

The problem here is that Mr. Winbush testified that
prior to May 22nd, 1989, he would not have recognized
who the petitioner was, (Tr. 3:18), nor does he know the
petitioner's name or ever saw him before. (Tr. 2:208).
He testified that when he saw the group of men chasing the
victim, he did not recognize anyone. (Tr. 3:18).  Not only
does he not know the petitioner, he did not see him on

-49-

` the day of the alleged incident.  The only way he identified
Mr. Tyler was through the actions of the police and "where"
he was placed in the police station to await his interview
with the police in identifying Mr. Tyler.  And what does
the police do, they put Mr. Winbush in an area where the
petitioner's photo was on "public display" as being a known
affiliate of the Intervale Street Gang.  Mr. Winbush con-
firms that he was only able to identify Mr. Tyler because
"While I was awaiting to view the photo array they placed
me in the Gang Task Force Unit room because I knew of Tyler
but could not recognize him, during my wait I did noticed
that one of the Two Leaders of the Intervale Gang was Derick
Tyler, and when I was finally taken to view photos I did
ID Tyler as the one because they(Police) wanted me too.
even though they had(3) different photos of Tyler I knew
it was him Tyler."  Aff. of Derrick Winbush at ¶ 6.

    There is a reasonable basis to conclude that the procedure
was impermissibly suggestive and violated petitioner's due
process rights.  The officers clearly directed Mr. Winbush
to an area which they should have known contained Mr.
Tyler's photo in public display along with other incriminating
and prejudicial evidence/information as well.

    If trial counsel would have properly investigated this
matter, he would have been able to present corroborating
evidence to support his defense of the suggestiveness of

-50-

the identification procedures conducted by the police which
would have established that this "suspect" identification
by Mr. Winbush was "notoriously unreliable" and "has distinct
impacts on juries." See Arizona v. Youngblood, 488 U.S.
51,73 n. 8 (1988).

Under due process standards evolved from the Fifth
and Fourteenth Amendments of the United States Constitution,
evidence of a pretrial identification is inadmissible
if obtained in a manner so impermissibly suggestive as
to give rise to a substantial likelihood of mistaken
identification. Kirby v. Illinois, 406 U.S. 682,690-91
(1972); Simmons v. United States, 390 U.S. 377 (1968).
What must not be overlooked here is that the identification
procedures may become unnecessarily suggestive due to
the way in which the police conducted it.  This factor has
to be considered in light of the facts of this case.

Trial counsel clearly denied the petitioner effective
representation at trial when he failed to avail himself
of the proper procedure for challenging the admissibility
of the impermissibly suggestive identification.  Especially
when  motions to suppress photographic and in-court identi-
fications must be filed before trial, Commonwealth v.
LaPierre, 408 N.E.2d 883,884 (1980), and not during trial.
And trial counsel exacerbated this error by conducting
pretrial non-suggestive identification proceedings. (Tr.

-51-

2:53-65). Such action constituted prejudicial error where,
but for counsel's error in presenting the suppression issue,
the burden of proof would have shifted to the Commonwealth
to demonstrate by clear and convincing evidence that any
in-court identification had an independent source before
it was introduced at trial.

Aside from relieving the Commonwealth of its burden
of establishing the admissibility of any in-court identi-
fication (that is but for counsel's error in presenting
the out-of-court issue), the pretrial non-suggestive
identification proceedings (line up) held at counsel's
behest was "manifestly unreasonable." Regardless to whether
counsel succeeded in suppressing the out-of-court identi-
fication, it cannot in the least constitute sound tactic
or strategy to submit the petitioner to such a "line up."
The impermissibly suggestive identification of Mr. Tyler
by Derrick Winbush at the police department could not but
infect the "non-suggestive identification" (line-up)
proceedings held at trial involving this witness. (Tr. 2:
53-65). Here, the witness, did not have an independent
source upon which to identify Mr. Tyler. It should have
reasonably been apparent to trial counsel that the con-
stitutionally tainted out-of-court identification would
so undermine the "non-suggestive identification" that it
made it all but inevitable that the witness would identify

-52-

the petitioner. See <u>Foster</u> v. <u>California</u>, 394 U.S. 440 (1969).

Had counsel properly presented the out-of-court identification issue, any in-court identification would have been excluded for lack of an independent source free of the effects of the unnecessarily suggestive out-of-court identification. The criteria for the independent source rule do not substantially differ from the factors to be considered in determining the reliability of an identification which results from an unnecessarily suggestive procedure which were set out in <u>Manson</u> v. <u>Brathwaite</u>, 432 U.S. 188 (1972).

The United States Supreme Court has held that "a convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable, professional judgment." <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668,690 (1984). [A]n attorney who fails even to interview a readily available witness whose non-cumulative testimony may potentially aid the defense should not be allowed automatically to defend his omission simply by raising the shield of 'trial strategy and tactics.' <u>Crisp</u> v. <u>Duckworth</u>, 743 F.2d 580,584 (7th Cir. 1984), cert. denied, 469 U.S. 1226 (1985). Moreover, eyewitnesses identification evidence, uncorroborated by a fingerprint, gun, confession, or co-

-53-

conspirator testimony, is a thin thread to shackle a man

for forty years. Griffin v. Warden, 970 F.2d 1355,1359

(4th Cir. 1992)(citation omitted).

Because of this grave error by defense counsel, the only

remedy is the reversal of conviction and order a new trial.

### VI. TRIAL COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO PROPERLY AND ADEQUATELY PREPARE, PRESERVE AND PRESENT DEFENDANT'S PLAUSIBLE ALIBI DEFENSE

The defendant shows that he was prejudiced by his attorney's

ineffectiveness by demonstrating that there is a reasonable

probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different.

Kimmelman v. Morrisson, 477 U.S. 366,381 (1986). A reasonable

probability is a probability sufficient to undermine con-

fidence in the outcome. Strickland v. Washington, 466 U.S.

668,694 (1984).

Throughout the defendant's contact with trial counsel

regarding the instant matter, beginning in or around August

of 1989, he continuously informed counsel and his representa-

tives that at the time of the murder of the decedent, at or

around 7:30 p.m. on May 22, 1989, he was at the Watertown Mall.

Mr. Tyler also informed counsel and his representatives

that Bernard Scott and Dana Hines, among others, were with

him and could and would substantiate his whereabouts. See

Aff. of Tyler.

Trial counsel retained the services of an investigator

out of an agency known as "Data Quest." Alexander Henderson, an investigator for Data Quest interviewed Bernard Scott on November 29, 1989. Mr. Scott substantially confirmed that he was with the defendant and others at the Watertown Mall at the time of the decedent's attack and subsequent death. Mr. Henderson subsequently also contacted and spoke with Dana Hines who also substantially corroborated the defendant's alibi. Mr. Henderson transmitted or otherwise conveyed the results and particulars of his interviews with Mr. Scott and Mr. Hines to trial counsel.

On or about April 16, 1990, merely two days before trial, counsel submitted a list of potential witnesses upon which he included both Mr. Scott and Mr. Dana Hines. On the morning of trial, April 18, 1990, just prior to drawing a jury, the Court inquired of the witnesses to be called by both parties. See (Tr. 1:5-6). On April 20, 1990, following the presentation of the Commonwealth's case and denial of the defendant's motion for directed verdict, the issue of alibi witnesses surfaced again. See (Tr. 3:76-77). Thereafter, trial counsel presented the testimony of one non-alibi witness, Derrick Younge. At the conclusion of Younge's examination, during a side-bar conference, and after Mr. Collora expressed his desire to present the testimony "of some other witnesses," (Tr. 3:133), defense counsel made the following statements:

-55-

> "I haven't gotten -- I cannot ask for an
> arrest warrant at this point. If I can
> get anything over within an hour, would
> ... someone still be here? I would file a
> motion with a copy to her and a copy of
> the return of service and ask for a warrant."
> (Tr. 3:133)

Inexplicably, without further explanation or action,
and to the surprise of the trial court, trial counsel rested
the case for the defense. See (Tr. 4:4).

Massachusetts Appeals Court recognizes that the failure
to call material witnesses who could have testified regarding
an alibi defense has been held to constitute ineffective
assistance of counsel. Commonwealth v. Aviles, 40 Mass. App.
Ct. 927, review denied, 423 Mass. 1105 (1996).  In the case
at bar, trial counsel appeared to be aware even before the
commencement of trial that two key alibi witnesses might
not appear.

The United States Supreme Court has held that "a convicted
defendant making a claim of ineffective assistance must
identify the acts or omissions of counsel that are alleged
not to have been the result of reasonable, professional
judgment." Strickland v. Washington, 466 U.S. 668,690 (1984).

Prior to trial, when the court inquired as to the street
addresses of all three alibi witnesses, trial counsel was
not "even sure" he served them. (Tr. 1:5).  Two days later
on April 20th, 1990, trial counsel reported to the court
that he was "still searching for one witness." (Tr. 2:76).
According to defense counsel the witness for whom he was
searching (Bernard Scott) had indicated to the A.D.A. and

-56-

to [his] office that he did not want to come in. (Tr. 2:76-77).
When the Court offered to issue a warrant for Mr. Scott,
and inquired as to who made service on him, trial counsel
could not thereupon say. (Tr. 2:76-77).

No further mention was ever made of either of the two
other alibi witnesses, Dana Hines and Darius Hines. And in
regard to Mr. Scott, trial counsel made the rather confusing
statement that "[he] cannot ask for an arrest warrant at
this point." While, in the same breath, making statements
which seem to indicate that he intended to take some action
to procure a warrant. (Tr. 3:133). No information was ever
given regarding whether any of the alibi witnesses had been
properly served. And, if so, by whom and where? Indeed,
trial counsel makes no mention of either Darius Hines or
Dana Hines after the court's pretrial inquiry regarding
their status as witnesses. As to Mr. Scott, trial counsel
apparently never got back to the court with the documentation
showing perfection of service on Mr. Scott. Trial counsel
also failed to come forward with the same documentations for
Dana and Darius Hines.

This court must determine, among other things, whether,
in light of all the circumstances, the identified acts or
omissions were outside the wide range of professionally com-
petent assistance. Whereas, "the reasonableness of counsle's
perspective at the time of alleged error." Kimmelman v.
Morrison, 477 U.S. at 377.

-57-

Here, however, it was not the court which deprived Mr. Tyler of his rights, but trial counsel. Were it not for counsel's inability to provide the court with the prerequisite name of the individual who purportedly made service on Mr. Scott, there cannot be any reason to doubt that the judge would have honored his word and caused a warrant to be served to secure the attendance of Mr. Scott.

Here, Mr. Tyler was deprived of a viable alibi defense, but for, counsel's incompetence. Counsel decision was not sound nor his decision tactical. If so, then his actions clearly violates the defendant's 6th Amendment rights. For such reasons, the defendant contends he was deprived of his rights to compulsory process, to present a defense, and all proofs favorable, as well as ineffective assistance in violation of the 6th and 14th Amendment to the United States Constitution. The writ should issue.

### (a). The contrary to, or an unreasonable application of, requirement.

This case is governed by the amendment to 28 U.S.C. § 2254 (1994 ed., Supp. III), enacted as a part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which provides:

> "(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

```
        "(1) resulted in a decision that was contrary to,
    or involved an unreasonable application of,
    clearly established Federal law, as determined
    by the Supreme Court of the United States....""
```

"[T]he text is fairly read simply as a command that a

fedral court not issue the habeas writ unless the state court

was wrong as a matter of law or unreasonable in its application

of law in a given case." Williams v. Taylor, 120 S.Ct. 1495,

1509 (2000). AEDPA plainly sought to ensure a level of

"'deference to the determinations of state courts,'" provided

those determinations did not conflict with federal law

or apply federal law in an unreasonable way. Id.

The petitioner's case here meets the criteria set in

Williams, supra.

## CONCLUSION

Federal law on the burden of proof in a criminal trial

requires that the Government prove each element of a crime

beyond a reasonable doubt.  The fundamental measure by which

juries find facts and determine the "truth" of a government

accusation is the standard of proof beyond a reasonable doubt

or it is not found at all.  A jury verdict returned on a

standard short of proof beyond a reasonable doubt is a verdict

without Constitutional significance.

No matter how heinous the crime, or how daunting the

prospect of staging a new trial, a proper conviction was

never rendered, and a new trial must be ordered.  The writ

should be granted and the defendant granted a new trial within

-59-

a reasonable amount of time, or released from custody imme-

diately.

Respectfully Submitted,

_____
Derick Tyler, pro se
MCI-Cedar Junction
P.O. Box 100
South Walpole, Ma. 02071

Dated:

## CERTIFICATE OF SERVICE

I, Derick Tyler, certify that I caused a true copy of the foregoing Memorandum of Law to be served on Thomas F. Reilly, Attorney General, One Ashburton Place, Boston, Ma. 02108, by first class mail, postage prepaid.

_____
Derick Tyler, Pro se

Dated:

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

Superior Trial Court
Criminal Division:
Docket No.#_____

2005 MAY 12  P 1: 51

U.S. DISTRICT COURT
DISTRICT OF MASS.

COMMONWEALTH

VS.

Derick Tyler

AFFIDAVIT OF DANA HINES

I, Dana Hines, depose and state that the following is a true and
accurate to the  best of my knowledge.

1). My name is Dana Hines, I am a citizen of the Commonwealth of
Massachusetts, and a resident of Boston, who reside at 157 Geneva
avenue #1. Dorchester, Mass. #02121.

2). On or about the day of may 22, 1989, around 7:00 p.m. my cousin
Darius Hines, and I,met a Mr.Tyler, and his brother at Watertown
Mall.

3).The reason for my cousin,and I, meeting  Mr.Tyler, and his bro-
ther that evening at the Watertown Mall, was so that my cousin and
I, could get the extra money needed to bail our friend out of jial,
who was arrested earlier that evening.

4). However, mycousin and I, did not bail our friend out of jial,
because Mr.Tyler, had informed us that we would not be able to bail
Mr.Williams, out because he was under the age of 17, So only his
immediate guardian could get him out.

5). So after a brief discussion my cousin Darius, and I, decide to·
just hang-out with Derick,and his brother Bernard, and do a little
shopping until about 8:30 or 9:00 p.m.

6). I was contacted by Mr.Tyler's, lawyer Michael, sometime ago as
to Mr.Tyler's, where-abouts on the evening of May 22, 1989, and I
had told the lawyer that my cousin and I, met Derick, and his bro-
ther at the Watertown Mall around 7:00 p.m.

7). The lawyer then asked me if I knew where Derick Tyler, lived at
and I said yes. Then asked me how long would it take to reach Water-
town Mall from where Mr.Tyler, live, and I told him that it would
take about a half an hour (30-minute),and thats without traffic.

8). Mr. Tyler's, lawyer Michael, told me that he would probably need
me to come into court and testify in Derick Tyler's, brief: But the
lawyer never get in touch with me.


Signed under the pain and penalties of perjury, free of threats and
coercion, promise and rewards, on this month and day of May 30 199 7



SIGNED BY Dana Henes

NOTARY PUBLIC. June Maria Carlton

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR TRAIL COURT
CRIMINAL DIVISION:
NO.

COMMONWEALTH

vs.

DERICK TYLER

AFFIDAVIT OF BERNARD SCOTT

Now comes the aforementioned affiant Bernard Scott, and clearly states as follows:

1) In regards to the trial of Derick Tyler in the above captioned case which occurred on April 19, 1990 and ended on the 24th of said month, I neither received notice nor summons to appear as a witness.

2) As I had been interviewed by an investigator purportedly working for the defense, and had informed him of Mr. Tyler's whereabouts at the time of the alleged murder in question, I thoroughly expected that I would, at minimum, received notice of the commencement of Mr. Tyler's trial.

3) Had I been given notice of the trial, or summons to appear, I would have attended said trail, and made myself available to testify.

4) I am willing now, as I was at the time of Mr. Tyler's trial to appear and give testimony as to what I know in regard to this matter, and in particularly as set forth above and in the attached interview.

Signed under the pains and penalties of perjury on this 17th

day of November 2000

Bernard

Patricia M. Perez
Notary Public

Commonwealth Of Massachusetts
– Suffolk



PATRICIA M. PEREZ
Notary Public
My Commission Expires
September 30, 2005